UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
THE UNITED STATES OF AMERICA, ex rel.,
MICHAEL SCHARFF,

                         Relator,                         13-cv-3791 (PKC)

      -against-                             MEMORANDUM
                                                  AND ORDER

CAMELOT COUNSELING,

                         Defendant.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

              Michael Scharff, the qui tam relator, brings this action under the False Claims

Act, 31 U.S. § 3729, et seq. (the "FCA"), on behalf of the United States of America.  Scharff

contends that defendant Camelot Counseling ("Camelot"), which operates substance-abuse

treatment centers, violated the FCA by submitting claims for Medicaid reimbursements that did

not comply with regulations adopted by an agency of the State of New York.  Scharff alleges that

when he complained about these practices to supervisors, Camelot terminated his employment in

retaliation.

              Camelot moves to dismiss the Amended Complaint (the "Complaint") pursuant to

Rules 12(b)(6) and 9(b), Fed. R. Civ. P.  Because the Complaint does not allege fraud with

particularity, the materiality of Camelot's regulatory non-compliance, or the existence of any

false claims, Camelot's motion to dismiss Counts One and Two is granted.  Because the

Complaint plausibly alleges that Scharff was terminated in retaliation for conduct protected by

the FCA, Camelot's motion to dismiss Count Three is denied.

BACKGROUND.

> For the purposes of deciding this motion to dismiss, all non-conclusory factual allegations are accepted as true, and all inferences are drawn in favor of Scharff.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

> Camelot operates ten substance abuse and rehabilitation centers in New York City.  (Compl't ¶ 14.)  It provides outpatient counseling and educational services to individuals with substance abuse problems.  (Compl't ¶ 15.)  Medicaid is a principal funding source for Camelot, and its centers are regulated by the Office of Alcoholism and Substance Abuse Services ("OASAS"), which is an agency of the State of New York.  (Compl't ¶¶ 16-17.)

> Scharff worked as a clinical supervisor at Camelot from November 7, 2011 to March 16, 2012.  (Compl't ¶ 12.)  He was hired as a clinical supervisor for Camelot's treatment centers in Queens, the Bronx and Manhattan, and states that he was one of two Credentialed Alcohol and Substance Abuse Counselors ("CASACs") employed by Camelot.  (Compl't ¶¶ 56-57.)  His job responsibilities included completing psychosocial evaluations and initial treatment plans for new patients, reviewing counselors' clinical notes and cross-referencing clinical notes for Medicaid compliance.  (Compl't ¶¶ 58-59.)

> According to Scharff, when he began work at Camelot, he observed that counselors failed to keep adequate notes about patients, billed time incorrectly and maintained records that contained apparent discrepancies between patient signatures.  These observations are the principal bases of his FCA allegations.

> Scharff claims that he observed specific instances of individual counselors "falsifying" patient records.  (Compl't ¶ 62.)  As an example, he alleges that at least three

counselors had a practice of copying and pasting notes about counseling sessions, and that one counselor's notes "lacked complete progress notes and often contained incoherent descriptions." (Compl't ¶¶ 62, 67-70.)  Scharff states that one counselor "routinely" held counseling sessions for less than the time required by Medicaid regulations, and would bill Medicaid for sessions at a 45-minute rate when a meeting actually lasted for just 25 minutes.  (Compl't ¶ 63.)  He observed that this counselor overbilled for approximately 45 sessions during a two-month period. (Compl't ¶ 64.)

Scharff also identified "missing or forged signatures" on patient sign-in sheets. (Compl't ¶¶ 71, 73.)  He raised his concerns about patient signatures with Camelot's compliance officer, who began an investigation and "confronted" a counselor about the signature discrepancies.  (Compl't ¶¶ 77-79.)  The counselor "admitted that she often allowed patients to sign in for each other."  (Compl't ¶ 79.)

Around the same time, Scharff e-mailed two supervisors about his concerns that a counselor was not actually writing her own patient notes.  (Compl't ¶ 80.)  Scharff asked whether the compliance officer should be copied on e-mails concerning billing discrepancies, and was told that he should not be.  (Compl't ¶ 81.)  On March 5, 2012, Scharff gave "a detailed report of the ongoing fraud he uncovered" to the compliance officer."  (Compl't ¶ 83.)  Less than two weeks later, Camelot terminated Scharff, and stated that although Scharff was doing a "good job," he was not working well with the other counselors.  (Compl't ¶ 84.)

Scharff is the original source of information in this action, and states that he has direct and independent knowledge of the Complaint's allegations.  (Compl't ¶¶ 6, 52.)  This action was originally filed under seal pursuant to the FCA's qui tam provisions, 31 U.S.C. § 3729(b)(1), and the United States Attorney's Office for this District commenced a formal

investigation thereafter.  (Nugent Dec. ¶¶ 3-4.)  Scharff provided the United States Attorney's

Office for this District with statements and documents relating to his claims.  (Compl't ¶ 55.)

The government issued a Civil Investigative Demand to Camelot, which produced more than

20,000 pages of documents relating to patient charts and billing records.  (Nugent Dec. ¶¶ 5-6.)

On November 12, 2014, the United States filed a notice stating that it declined to intervene in

this action.  (Docket # 9.)

MOTION TO DISMISS STANDARDS UNDER RULE 12(b)(6) AND RULE 9(b).

      "In alleging fraud or mistake, a party must state with particularity the

circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of

a person's mind may be alleged generally."  Rule 9(b).  To plead a fraudulent misstatement, "the

plaintiff must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify

the speaker, (3) state where and when the statements were made, and (4) explain why the

statements were fraudulent."  Anschutz Corp. v. Merrill Lynch & Co., Inc., 690 F.3d 98, 108 (2d

Cir. 2012) (internal quotation marks omitted).

      Counts One and Two of the Complaint allege that Camelot violated the FCA by

submitting false claims for Medicaid reimbursement.  Because the False Claims Act is an anti-

fraud statute, "claims brought under the FCA fall within the express scope of Rule 9(b)."  Gold

v. Morrison-Knudsen Co., 68 F.3d 1475, 1477 (2d Cir. 1995); accord United States ex rel. Ladas

v. Exelis, Inc., 824 F.3d 16, 26 (2d Cir. 2016) ("The Rule 9(b) principles apply to complaints

filed under the False Claims Act.").  While the text of the FCA expressly states that it does not

require "proof of specific intent to defraud," 31 U.S.C. § 3729(b)(1)(B), "this does not conflict

with Rule 9(b)," since "[m]alice, intent, knowledge, and other condition of mind of a person may

be averred generally." Gold, 68 F.3d at 1477.  Rather, to satisfy Rule 9(b), a complaint must "state with particularity the specific statements or conduct giving rise to the fraud claim."  Id.

Count Three alleges that Scharff was terminated as retaliation for notifying supervisors of alleged misconduct, and because this count does not implicate fraudulent behavior, Camelot's motion to dismiss is reviewed pursuant to Rule 12(b)(6) rather than Rule 9(b).  To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, 556 U.S. at 678 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Legal conclusions are not entitled to the presumption of truth, and a court assessing the sufficiency of a complaint disregards them.  Id.  Instead, the Court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.  "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'"  Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE, 763 F.3d 198, 208-09 (2d Cir. 2014) (quoting Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000)).

DISCUSSION.

I.    Overview of the FCA.

The FCA provides that "any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . . is liable to the United States Government . . . ."  31 U.S.C. § 3729(a)(1)(A).  It also provides that "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . is liable to the United States Government . . . ."  31 U.S.C. § 3729(a)(1)(B).  To state a claim for relief under the FCA, a relator must allege with particularity

that a defendant "'(1) made a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury.'" Bishop v. Wells Fargo & Co., 823 F.3d 35, 43 (2d Cir. 2016) (quoting Mikes v. Straus, 274 F.3d 687, 695 (2d Cir. 2001), abrogated on other grounds by Universal Health Servs., Inc. v. United States, 136 S. Ct. 1989 (2016)).

"The FCA was enacted in 1863 to combat fraud by defense contractors during the Civil War.  Consistent with its origin, the archetypal FCA claim involves a factually false request for payment from the government, as when a contractor delivers a box of sawdust to the military but bills for a shipment of guns."  Bishop, 823 F.3d at 43 (internal citation omitted).  In addition to express factual falsehoods, a defendant may be liable for "legally false" claims that falsely certify compliance with a regulation or a statute containing a material condition for government payment.  Id.; United Health Servs., 136 S. Ct. at 1999.

However, "[t]he False Claims Act is not an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations."  Id. at 2003 (internal citation and quotation marks omitted); Bishop, 823 F.3d at 49 ("the FCA was not designed to reach every kind of fraud practiced on the Government.").  A complaint must "plausibly connect[ ]" the defendant's alleged fraud to "claims submitted to the government for payment . . . ."  Id.

Scharff alleges that Camelot submitted false claims for Medicaid reimbursement.  The Medicaid Act, 42 U.S.C. § 1396, et seq., created "a cooperative federal-state program designed to provide medical assistance to persons whose resources are insufficient to meet the costs of their necessary medical care."  Davis v. Shah, 821 F.3d 231, 238 (2d Cir. 2016).  New York Mental Hygiene Law § 19.07 established the OASAS to oversee the state's alcohol and

substance-abuse treatment facilities.  OASAS has adopted regulations setting standards for

Medicaid reimbursement.  See 14 N.Y.C.R.R. § 839.1.  OASAS requires that "[e]ach alcoholism

facility enrolled as a Medicaid provider shall comply with all applicable requirements of the

Department of Social Services."  14 N.Y.C.R.R. § 839.8.  It also requires that "[a]ll information

provided in relation to any claim for payment shall be true, accurate and complete."  14

N.Y.C.R.R. § 839.7(e).

II.     The Complaint Fails to Allege Fraud with Particularity.

According to the Complaint, from 2007 through 2012, Camelot submitted false

records and certifications to the United States to secure the payment of Medicaid

reimbursements.  (Compl't ¶¶ 86, 91.)  Scharff alleges that Camelot "made deliberate false

representations" of patient records and billed Medicaid for excessive and unnecessary services.

(Compl't ¶ 3.)

The purported misconduct identified by Scharff does not plausibly amount to

fraud.  At most, the Complaint describes a series of seemingly unrelated practices of individual

counselors that reflect an inattention to detail, accompanied by conclusory labels describing the

conduct as fraudulent.  The Complaint makes no allegations that Camelot requested Medicaid

reimbursement for services that were not actually provided.  Whether the acts of purported

misconduct are viewed in isolation or collectively, they do not allege with particularity that

Camelot fraudulently sought Medicaid reimbursement payments.

A.  Counselor Notes and Patient Signatures.

Scharff contends that individual counselors were "falsifying records," and, as

support, alleges that a counselor "copy-and-pasted the notes" for each individual patient who

attended a group session held on November 8, 2011, instead of drafting notes specific to each

patient.  (Compl't ¶ 62.)  The Complaint does not explain why a counselor's notes for a group session required individualized descriptions for each patient or why drafting a uniform account for all patients at a group session was fraudulent.  The allegation that this counselor copied-and-pasted patient assessments from a group session does not fit within the label of "falsifying records."  (Compl't ¶ 62.)  Further, there is no allegation that these sessions did not take place, or that the counselor or Camelot fabricated records for non-existent patients.

Scharff makes several allegations concerning the recordkeeping practices of another counselor, who he alleges "regularly copy-and-pasted notes from one counseling session to another."  (Compl't ¶ 70.)  He reported to his supervisor that this counselor's notes often had "incoherent descriptions" and "lacked complete progress notes."  (Compl't ¶ 70.)  Scharff informed his supervisors that he believed the counselor's daughter, who also worked for Camelot, was the actual author of these patient notes.  (Compl't ¶¶ 80, 83.)

He also observed that patient signatures submitted by this counselor "differed significantly" from document to document, and continued to do so even after he reported the issue.  (Compl't ¶¶ 73, 75.)  This counselor later told Camelot's compliance officer that she permitted patients to sign in for each other.  (Compl't ¶ 79.)

The Complaint does not allege with particularity how this conduct rises to the level of fraud.  There is no allegation as to the level of detail required of patient notes or what is meant by Scharff's description of "incoherent" notes.  Assuming that this counselor permitted patients to sign in for one another, the Complaint does not allege that Camelot sought reimbursement for services made to non-existent patients or that these patients were not, in fact, attending counseling sessions.  It also is unclear why Scharff concluded that this counselor was not writing her own patient notes, and whether that conclusion is based solely on speculation or

inference.  Assuming the truth of these allegations, Scharff may have alleged that this counselor did a poor job of documenting her interactions with patients, but he has not alleged how her conduct amounted to fraud or facilitated false claims for Medicaid reimbursement.

The Complaint alleges that one counselor "regularly" billed Medicaid for sessions at a 45-minute rate, when she only met with patients for 25 minutes.  (Compl't ¶¶ 63-64.)  The Complaint does not allege how Scharff reached this conclusion, and vaguely alleges that he "learned" about the length of these sessions.  The Complaint also notes that one counselor failed to obtain approximately 450 required patient signatures for her treatment plans, and that another counselor failed to obtain signatures in approximately sixty instances.  (Compl't ¶¶ 66, 68.)  Yet the Complaint again fails to allege with particularity why these practices were fraudulent, as opposed to sloppy, and does not identify their consequences for Camelot's Medicaid reimbursement claims.

The Complaint does not allege that these counselors' practices concerning patient signatures and notes were the consequence of a Camelot policy.  It also does not allege that Camelot had an informal custom that encouraged this behavior.  At most, the Complaint has described unrelated, uncoordinated flaws in the recordkeeping of individual counselors.  Scharff has not alleged with particularity why their conduct amounts to fraud.

B.  The Staff Meeting of October 2011.

Scharff alleges that he attended a meeting in October 2011,[1] where members of Camelot's "treatment plan review team" each "signed and back-dated" approximately eight-to-ten patient treatment plans.  (Compl't ¶ 61.)  The Complaint contains no additional details as to

---

[1] Apparently in error, the same paragraph of the Complaint also identifies the meeting as having taken place in October 2012.  (Compl't ¶ 61.)  The Complaint also alleges that Scharff did not begin his employment at Camelot until November 7, 2011, which post-dates the October 2011 meeting described in the Complaint.  (Compl't ¶ 12.)  The Court nevertheless assumes the truth of Scharff's allegation that he attended this October 2011 meeting.

the purported back-dating or its consequences for Camelot's claims for Medicaid reimbursement. At that same meeting, the Complaint alleges that the team-members did not review or evaluate the proposed plans, but signed them without analysis "in an effort to outwardly appear in compliance with Medicaid regulations while blatantly ignoring their obligations." (Compl't ¶ 61.) The Complaint does not explain what is meant by the allegation that the team members did not evaluate the proposed plans. Moreover, there are no supporting allegations concerning the employees' supposed intent to "blatantly ignor[e] their obligations" to comply with Medicaid regulations. While intent may be averred generally, and the FCA does not require proof of an intent to defraud, <u>see</u> <u>Gold</u>, 68 F.3d at 1477, this allegation is a conclusory, unsupported label. The Complaint's vague and general allegations concerning the conduct at this October 2011 meeting lack the particularity required by Rule 9(b).

        C.  <u>Camelot's Staffing Obligations.</u>

        Scharff also claims that Camelot violated the FCA because Camelot "failed to staff enough qualified health professionals ('QHPs') or CASAC trainees at each of their treatment centers in violation of 14 NYCRR 822-5.9 . . . ." (Compl't ¶ 5(d).) Elsewhere, the Complaint alleges that at the time that he was hired, he "became one of only two CASACs working for Defendant." (Compl't ¶ 57.) 14 N.Y.C.R.R. § 822-5.9(j) requires that "[a]t least 50 percent of all clinical staff must be Qualified Health Professionals or CASAC Trainees."

        Aside from the allegation of paragraph 5(d), the Complaint makes no allegations as to the number of Qualified Health Professionals or CASAC trainees employed by Camelot. It makes no allegation as to the number of such individuals employed at treatment centers, the qualifications of the employees at Camelot's treatment centers or Camelot policies concerning the hiring or assignment of QHPs or CASAC trainees. Because the Complaint fails to make any

supporting allegations about Camelot's use of Qualified Health Professionals or CASAC trainees, it does not allege that Camelot failed to comply with OASAS regulations.

 In opposition to Camelot's motion, Scharff advances a different theory of liability. Scharff now argues that Camelot ran afoul of OASAS regulations because it did not specifically assign a full-time CASAC to each of its outpatient centers. (Opp. Mem. at 9-10.)

 Although "new facts and allegations, first raised in a Plaintiff's opposition papers, may not be considered in deciding a motion to dismiss," Ward v. Andrews McMeel Pub., LLC, 963 F. Supp. 2d 222, 231 (S.D.N.Y. 2013) (quotation marks omitted), Scharff's newly proposed theory of liability would still fail to allege non-compliance. He cites to a regulation that requires each program to have "a qualified health professional designated as the full-time on-site clinical director . . . ." 14 N.Y.C.R.R. § 822.7(k)(1). Scharff argues that Camelot failed to comply with this obligation because, at the time of his hiring, he was one of only two CASACs employed by Camelot. (Compl't ¶ 57.)

 But "qualified health professional" is a defined term in OASAS regulations. See 14 N.Y.C.R.R. § 800.3(*l*). It lists twelve different professions that fall within the definition, including not only CASACs but licensed physicians, physician's assistants, certified nurse practitioners, registered nurses, psychologists, occupational therapists and social workers, among others. Id. § 800.3(*l*)(5). The Complaint alleges that Scharff was one of two CASACs employed by Camelot, but it makes no allegations concerning these other categories of employees and whether each facility had designated a qualified health professional as its on-site director. Thus, even if the Complaint had proposed this theory of liability, it fails to include supporting allegations that go toward Camelot's non-compliance with OASAS staffing regulations.

- 11 -

The Complaint therefore fails to allege with particularity that Camelot violated OASAS staffing regulations.

D.  Scharff's Communications with Supervisors.

The Complaint alleges that when Scharff informed his supervisors and Camelot's compliance officer of his observations, they attempted to take some corrective measures. Camelot's compliance officer "commenced an investigation" into Scharff's concerns, whereupon one of the counselors acknowledged that she had been permitting patients to sign in for one another.  (Compl't ¶¶ 78-79.)  After Scharff informed the compliance officer of his observations, a supervisor instructed Scharff to contact him directly with billing and compliance concerns. (Compl't ¶ 81.)  While the Complaint alleges that signature discrepancies continued a week after Scharff first raised the issue (Compl't ¶ 74-75), the Complaint alleges that, when informed of Scharff's observations, Camelot's management undertook an internal investigation and confronted at least one counselor about her recordkeeping practices.  The responsiveness of Camelot's managers, and particularly the actions of its compliance officer, is inconsistent with Scharff's conclusory allegations of fraudulent conduct.

Ultimately, Scharff's FCA allegations are principally based on his observations that some forms were either missing patient signatures or included signatures where patients signed in for one another, and that counselors drafted inadequate summaries of their interactions with patients.  The Complaint has not alleged with particularity how these practices, though imprecise, rise to the level of fraud.  Because Count One and Count Two of the Complain fail to allege fraud with particularity, they are dismissed.

III.    The Complaint Fails to Allege the Submission of Any False Claim.

Counts One and Two are dismissed for the separate reason that the Complaint fails to allege the submission of any false claim.  In Ladas, the Second Circuit affirmed a district court's dismissal of a complaint that "did not contain plausible allegations of fact that showed, as required for FCA purposes, that any claim for payment submitted by [defendants] was false . . . ."  824 F.3d at 27; see also Wood ex rel. United States v. Applied Research Assocs., Inc., 328 Fed. Appx. 744 (2d Cir. 2009) (summary order) (affirming dismissal of complaint that "fail[ed] to specify the time, place, speaker, and even the content of the alleged misrepresentations.") (quotation marks omitted).

Several opinions in this District have discussed in detail why the FCA requires a complaint to allege with particularity the contents and circumstances of a purportedly false claim.  In United States ex rel. Kester v. Novartis Pharmaceuticals Corp., 23 F. Supp. 3d 242, 252-60 (S.D.N.Y. 2014), now-Chief Judge McMahon concluded that "[a] complaint's description of a fraudulent scheme paired with information about a defendant's standard billing practice is not enough 'particular' information to fulfill the purposes of Rule 9(b); the plaintiff must provide a detailed factual basis to support his allegation that the defendant submitted a false claim in this specific instance, not just that the defendant had a custom of submitting claims."  Id. at 255 (emphasis in original).  As Kester explained:

> Given that submission of a false claim is an essential element of subsections (a)(1)(A) and (a)(1)(B), requiring a plaintiff to provide enough detail for a defendant to be able to reasonably identify particular claims that are allegedly false better fulfills the central purpose of Rule 9(b) – providing fair notice to the defendant.  It also weeds out FCA claims brought by plaintiffs who are merely speculating that false claims might have been submitted to the government.  This serves the other purposes of Rule 9(b): safeguarding defendants' reputations from improvident charges of wrongdoing, protecting defendants from strike suits, and

- 13 -

>discouraging the filing of suits as a pretext for the discovery of
>unknown wrongs.

Id. at 256 (internal citations omitted).  A relator may satisfy the pleading requirement by "(1)
providing sufficient identifying information about all the false claims, or (2) providing example
false claims."  Id. at 258.

This Court adopted Kester's reasoning in Corporate Compliance Associates ex
rel. United States v. New York Society for the Relief of the Ruptured and Crippled, Maintaining
the Hospital for Special Surgery, 2014 WL 3905742 (S.D.N.Y. Aug. 7, 2014).  The undersigned
noted that the complaint failed to cite a single example of a false claim, and observed: "Stating
that the [defendant] lied to the federal government more than 350,000 times about where services
were rendered makes for a useful club in a claimant's hands, but it does not provide the
particularity that Rule 9(b) requires.  Fraud is a serious allegation, and Rule 9(b) provides
meaningful protection against blunderbuss claims of fraud."  Id. at *16.

Other courts have adopted Kester's reasoning as to the requirements of alleging
the existence of false claims.  See, e.g., United States ex rel. NPT Assocs. v. Lab. Corp. of Am.
Holdings, 2015 WL 7292774, at *6 (Nov. 17, 2015) (Carter, J.) (complaint did not satisfy Rule
9(b) when it failed "to provide Defendant with notice of the claims at issue . . . ."); United States
ex rel. Ortiz v. Mount Sinai Hosp., 2015 WL 7076092, at *9-10 (Nov. 9, 2015) (Berman, J.)
(complaint's allegations concerning the submission of specific claims satisfied Rule 9(b)); 
United States ex rel. Ramos v. Icahn Sch. of Med. at Mount Sinai, 2015 WL 5472933, at *5
(S.D.N.Y. Sept. 16, 2015) (Daniels, J.) (under reasoning of Kester, alleged creation of false
records was inadequate to allege that false claims were actually submitted); United States ex rel.
Bilotta v. Novartis Pharma. Corp., 50 F. Supp. 3d 497, 525-26 (S.D.N.Y. 2014) (Gardephe, J.)
(complaint's inclusion of "specific false reimbursement claims" satisfied Rule 9(b)).

Here, the Complaint makes no allegations that relate to the submission of any false claim.  It does not attach a sample of any false claim or describe the contents or format of Camelot's reimbursement claims.  The Complaint does not even include "information about [the] defendant's standard billing practice" or describe "a custom of submitting claims," both of which Chief Judge McMahon deemed inadequate to allege the submission of false claims.  Kester, 23 F. Supp. 3d at 255.  For example, it is unclear whether the counselor notes that were allegedly copied-and-pasted for patients' group sessions were submitted as part of a reimbursement claim or whether they were a matter of internal recordkeeping.  It also is unclear whether Camelot made any certification as to its practices for collecting patient signatures and whether forms signed by patients were submitted as part of Medicaid reimbursement claims.

Because the Complaint fails to identify the submission of any false claim, or even identify the contents that were required in a claim for Medicaid reimbursement, Count One and Count Two are dismissed.

## IV.     The Complaint Does Not Allege Materiality.

Counts One and Two are separately dismissed because the Complaint fails to allege the materiality of Camelot's purported non-compliance with OASAS regulations.

Under the FCA, a "misrepresentation must be material to the other party's course of action."  Universal Health Services, 136 S. Ct. at 2001.  A person seeking payment from the government is liable under the FCA only when a misrepresentation is material to the government's payment.  See id. at 2001-02.  The materiality of a statement does not need to be an express condition set by statute or regulation.  See id.  For example, if the government does not specify that the guns it purchases must actually shoot, and a seller knowingly sells the

- 15 -

government non-functioning guns, the seller would be liable under the FCA, even if payment was not expressly conditioned on the guns' functionality.  See id.

At the same time, mere non-compliance with a regulation is not enough to give rise to FCA liability.  See id. at 2002.  As the Supreme Court described it: "[B]illing parties are often subject to thousands of complex statutory and regulatory provisions.  Facing False Claims Act liability for violating any of them would hardly help would-be defendants anticipate and prioritize compliance obligations."  Id.  Regulatory non-compliance "must be material to the Government's payment decision in order to be actionable under the False Claims Act."  Id. Proof of materiality may include an express, material condition of payment, or knowledge by the defendant that the government routinely refuses to pay claims based on failure to comply with a certain requirement.  Id. at 2003.  "The materiality standard is demanding" because the FCA is not "a vehicle for punishing garden-variety breach of contract or regulatory violations."  Id. at 2003.  Materiality "cannot be found where noncompliance is minor or insubstantial."  Id.

Like this case, Universal Health Care involved defendants' alleged failure to comply with Medicaid regulations.  See id. at 1997-98.  Universal Health Care stated that the relators must sufficiently allege that the defendant "misrepresented its compliance with mental health facility requirements that are so central to the provision of mental health counseling that the Medicaid program would not have paid these claims had it known of these violations."  Id. at 2004.  "We emphasize, however, that the False Claims Act is not a means for imposing treble damages and other penalties for insignificant regulatory or contractual violations."  Id. at 2004.

The Complaint summarizes OASAS regulations concerning the general process of paying Medicaid reimbursements, as well as the obligations of outpatient facilities that treat chemical dependency to develop treatment plans and document patient therapy.  (Compl't ¶¶ 25-

51.)  However, aside from the conclusory assertion that Camelot "failed to comply with material Medicaid regulations that served as conditions precedent for Camelot to receive reimbursement through federal funds for the services that Camelot provided," the Complaint makes no allegation as to the materiality of Camelot's alleged non-compliance.  (Compl't ¶ 3.)  It does not connect specific conduct by Camelot's counselors to specific submissions for reimbursement, or explain why the purportedly fraudulent conduct was material to the payment of reimbursements.  The Complaint does not cite any express condition for reimbursement applicable to Camelot, nor does it allege whether the government has refused to reimburse clinics that have engaged in conduct similar to Camelot's.[2]

Scharff has failed to satisfy the "demanding" requirement for alleging materiality under the FCA.  Universal Health Care, 136 S. Ct. at 2003.  For this additional reason, Count One and Count Two of the Complaint are dismissed.

V.      The Complaint Fails to Allege the Existence of a "Scheme" or "Conspiracy".

According to the Complaint, Camelot "and its agents conspired to engage in fraudulent billing schemes."  (Compl't ¶ 4(a).)  It also alleges that Camelot, its employees and agents knowingly presented false claims "individually and in concert . . . ."  (Compl't ¶¶ 86, 91.)

The FCA contains a provision making it unlawful to "conspire[ ] to commit a violation" of the statute.  31 U.S.C. § 3729(a)(1)(C).  While the Complaint cites this provision in its initial paragraph and its prayer for relief, it brings no separate cause of action for conspiracy to violate the FCA.

---

[2] United Health Care expressly abrogated the Second Circuit's previous standard for determining materiality, which looked only to whether a statute, regulation or contract expressly required compliance in order to receive payment.  See 136 S. Ct. at 1999, abrogating Mikes, 274 F.3d at 700.  The Court notes that the Complaint's allegations would fail to allege materiality under the Mikes standard, which was in effect at the time the Complaint was filed.

Generously construing the Complaint as seeking relief for a "conspiracy" to violate the FCA, the Court concludes that it falls far short of the pleading requirements of Rule 9(b).  It "fails to identify a specific statement where [individuals] agreed to defraud the government."  Ladas, 824 F.3d at 27; see also Kester, 23 F. Supp. 3d at 268 (to state a claim of conspiracy under the FCA, the complaint must allege "(1) an unlawful agreement by the defendant to violate the FCA, and (2) at least one overt act performed in furtherance of that agreement.").

The Complaint makes no allegations as to the existence of any agreement to violate the FCA.  To the extent that it purports to bring a claim for conspiracy, any such claim is dismissed.

VI.     The Complaint Does Not Make Allegations Related to Conduct that Pre-Dates Scharff's Employment.

The Complaint alleges that Camelot's purported misconduct occurred "on or before 2007 through 2012 . . . ."  (Compl't ¶¶ 86, 91.)  However, the Complaint contains no allegations concerning Camelot's practices or Medicaid reimbursement claims that pre-date the commencement of Scharff's employment in October 2011.  To the extent that the Complaint seeks relief for Camelot's reimbursement claims prior to October 2011, those claims are dismissed.

VII.    The Complaint Plausibly Alleges a Claim of Retaliation.

The FCA makes it unlawful to terminate any employee in retaliation for taking protected actions under the FCA.  As this Court has previously observed, "[t]he heightened pleading requirements of Rule 9(b), Fed. R. Civ. P., do not apply to a retaliation claim under 31 U.S.C § 3730(h) because it does not require a showing of fraud."  Garcia v. Aspira of New York,

- 18 -

Inc., 2011 WL 1458155, at *3 n.1 (S.D.N.Y. Apr. 13, 2011) (citing U.S. ex rel. Karvelas v.

Melrose-Wakefield Hosp., 360 F.3d 220, 238 n. 23 (1st Cir. 2004)).

       The FCA states that "[a]ny employee . . . shall be entitled to all relief necessary to

make that employee . . . whole, if that employee . . . is discharged . . . because of lawful acts

done by the employee . . . in furtherance of an action under this section or other efforts to stop 1

or more violations of this subchapter."  31 U.S.C. § 3730(h)(1).  The Second Circuit "has yet to

articulate a test for deciding when a plaintiff has set forth a claim for retaliation under section

3730(h) . . . ."  Weslowski v. Zugibe, 626 Fed. App'x 20, 22 (2d Cir. 2015) (summary order).  It

has, however, observed that "[t]he failure" of a relator's qui tam action "does not necessarily

preclude him from seeking protection from retaliation under § 3730(h)."  ABC v. NYU Hosps.

Ctr., 629 Fed. App'x 46, 49 (2d Cir. 2015) (summary order).

       "[A] claim for illegal retaliation under § 3730(h) requires a plaintiff to show (1)

the employee engaged in conduct protected under the FCA; (2) the employer knew that the

employee was engaged in such conduct; and (3) the employer discharged, discriminated against

or otherwise retaliated against the employee because of the protected conduct."  McAllan v. Von

Essen, 517 F. Supp. 2d 672, 685 (S.D.N.Y. 2007) (Holwell, J.).

       "The inquiry as to whether an employee engaged in protected conduct involves

determining whether an employee's actions sufficiently furthered an action filed or to be filed

under the FCA, and, thus, equated to 'protected conduct.'"  Id.  "Protected activity" is interpreted

broadly, and "an employee's activities may be protected even where an FCA suit has not been

filed." Faldetta v. Lockheed Martin Corp., 2000 WL 1682759, at *12 (S.D.N.Y. Nov. 9, 2000)

(Casey, J.).  "Simply put, the plaintiff must demonstrate that her investigation, inquiries, and/or

testimony were directed at exposing a fraud upon the government." Grant v. Abbott House, 2016 WL 796864, at *7 (S.D.N.Y. Feb. 22, 2016) (Roman, J.).

As to the second element, the Complaint must plausibly allege "that the employee was discharged because of activities which gave the employer reason to believe that the employee was contemplating a qui tam action against it." Garcia, 2011 WL 1458155, at *5 (quotation marks omitted).  It also must allege that the employer knew that the plaintiff "was engaging in protected conduct." Faldetta, 2000 WL 1682759, at *13.  Weslowski affirmed the dismissal of a retaliation claim because the plaintiff did not adequately allege that his employer "was aware that" his actions were "in furtherance of efforts to prevent a violation of the FCA." 626 Fed. Appx. at 22.

Here, the Complaint alleges that on or about March 5, 2012, Scharff informed his supervisors and others that he "had discovered 358 examples of false information submitted to Medicaid for reimbursement . . . ."  (Compl't ¶ 83.)  Less than two weeks later, Camelot terminated Scharff, and told him that although he "was doing a 'good job,' he was not working out with the other counselors . . . ."  (Compl't ¶ 84.)  The Complaint plausibly alleges that Scharff told his supervisors of his belief that they had submitted false claims for Medicaid reimbursement, and that he was terminated shortly thereafter.  As discussed, Scharff had previously raised his concerns with supervisors and with Camelot's compliance officer, and advised him that he believed Camelot was not complying with Medicaid regulations.  (Compl't ¶¶ 72-77, 81.)  Scharff has plausibly alleged that he engaged in protected conduct under the FCA, that his supervisors were aware of this conduct, and that he was terminated after raising his concerns.

The plausibility of Scharff's retaliation claim is strengthened by the temporal proximity between his communications to supervisors and his subsequent termination.  See United States ex rel. Lee v. Northern Adult Daily Health Care Center, 2016 WL 4703653, at *15 (E.D.N.Y. Sept. 7, 2016) (temporal proximity between plaintiff's constructive discharge and protected conduct supported plausibility of FCA retaliation claim).  Putting aside the infirmities of Scharff's substantive FCA allegations, he has sufficiently alleged that he engaged in conduct protected by the FCA, that Camelot was aware of this conduct, and that he was terminated as a result.  See generally McAllan, 517 F. Supp. 2d at 685.

Camelot's motion to dismiss the retaliation claim in Count Three is therefore denied.  The claim, of course, may look much different at the summary judgment stage. CONCLUSION.

The defendant's motion to dismiss is GRANTED as to Count One and Count Two, but DENIED as to Count Three.  The Clerk is directed to terminate the motion.  (Docket # 46.)

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
        September 28, 2016

- 21 -